Jennifer R. Lloyd, Esq.
Nevada Bar No. 9617
Jonathan W. Fountain, Esq.
Nevada Bar No. 10351
HOWARD & HOWARD ATTORNEYS PLLC
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 257-1483
Facsimile:  (702) 567-1568
Email: jl@h2law.com
Email: jwf@h2law.com

*Attorneys for Defendant
HCAFranchise Corporation*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| TERRIER, LLC; SUSAN BRUKETTA; and HAROLD PASCOE;<br><br>Plaintiffs,<br><br>vs.<br><br>HCAFRANCHISE CORPORATION,<br><br>Defendant. | Case No.  2:22-cv-01325-GMN-EJY<br><br>**DECLARATION OF MICHELE BOEHMER IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Michele Boehmer declare and state the following:

1. I am the Head of Franchising for TheKey, LLC, parent company to Defendant HCAFranchise Corporation ("HCA"), and in that capacity, I am authorized to make this Declaration on its behalf. I have been employed in this role since February 2021. Prior to that, I was the Head of Franchise Support for approximately five (5) years.

2. I have personal knowledge of the facts set forth herein and am competent to testify to the same.

3. I make this Declaration in opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction.

4. HCA is a Nevada corporation that was incorporated in 2003.

5. HCA first began offering franchises in February 2004.

6. HCA grants franchises for non-medical home care agencies that offer an assortment of services including: companionship; personal care; meal preparation; light

1

housekeeping; laundry; errands and transportation, on a live-in and live-out basis. HCA franchisees use HCA's distinctive and proprietary system for the operation of a home care agency ("System") and the trademarks HOME CARE ASSISTANCE and HOME CARE ASSISTANCE 1-866-4-LIVEIN ("HCA Trademarks").

7. HCA's parent company is TheKey, LLC ("The Key"), formerly known as Home Care Assistance Holdings, LLC. Through subsidiaries, TheKey operates non-medical home care agencies that, until in or around December 2021, were operated under the trademarks HOME CARE ASSISTANCE and HOME CARE ASSISTANCE 1-866-4-LIVEIN.

8. In or about December 2021, TheKey's subsidiaries began operating under the trademark THEKEY.

9. Over the nearly two decades that HCA has offered franchises, HCA has amended and updated the language in its form franchise agreement—the form that HCA uses to offer franchises to new and renewing franchisees—many times.

10. One such change was to add an explicit right by HCA to purchase the franchisee's business as a going concern. This change was made to the form franchise agreement that HCA began using in February 2011 and, as is required by federal and State law, was thereafter included in HCA's Franchise Disclosure Document ("FDD"). A true and accurate copy of HCA's 2011 FDD is attached hereto as **Exhibit 1**.

11. That "Purchase Right" provision has continuously been a part of HCA's form franchise agreement since February 2011. The language changed slightly over the years, but the substance of the provision has remained the same since then.

12. Since February 2011, HCA has sold more than 100 franchises. The Purchase Right provision was contained in the form franchise agreement for every single one of those franchise sales.

13. Since HCA began including the Purchase Right provision in its franchise agreement in February 2011, there have not been any franchisee agreements that have reached the end of their respective terms, and therefore been up for renewal, before Plaintiffs' franchise agreement came up for renewal. Plaintiffs are the first franchisees to have their franchise

agreement come up for renewal since HCA began including the Purchase Right provision in its franchise agreement.

**The Franchise Agreement**

14. HCA entered into a franchise agreement with Plaintiffs Susan Bruketta ("Bruketta") and Harold Pascoe ("Pascoe") on or about December 27, 2006 (the "Franchise Agreement"). An incomplete copy of the Franchise Agreement is attached as Exhibit A to Plaintiff's Complaint in this matter. Plaintiffs omitted an addendum from the agreement. A true and accurate copy of that addendum is attached hereto as **Exhibit 2**.

15. In or around the time the Franchise Agreement was executed, HCA's parent company had been operating its company-owned location for approximately three years, and had been granting franchises for a little more than two years. At that time, there were five company-owned locations and approximately 10 franchisee-owned locations.

16. The Franchise Agreement grants Plaintiffs a non-exclusive license to operate a franchise for "the term set forth in [the] Agreement." *See* Exhibit A, Franchise Agreement, Section 2.1.

17. The term of the Franchise Agreement is 15-years. The term "commences on the Effective Date and ends at the end of the month in which the fifteenth anniversary of the Effective Date occur." *Id*. at Section 4.1.

18. In the Franchise Agreement, Terrier agreed that it "acquires no right to, and upon termination or expiration of this Agreement, is entitled to no compensation for, any good will associated with the Marks or the System . . . " in connection with its operation of a franchise. *Id*. at Preamble C.

19. Plaintiffs acknowledged that they obtained knowledge of proprietary matters, techniques and business procedures from HCA that are necessary to operate their franchised business, and without which they could not effectively and efficiently operate the franchised business, and further that "Franchisor owns all Confidential and Proprietary System Information." *Id* at. Sections 14.1 and 14.3.

20. HCA's Confidential Information is defined as proprietary information

3

communicated to Franchisee and any other knowledge or know-how concerning the methods of operation of the Franchised Business, and includes customers, operating procedures and the services and products offered to customers. *Id*. at Section 14.4.

21. The Franchise Agreement states that HCA retains the right to operate, develop and change its franchise system in any manner not precluded by the Franchise Agreement.

22. The Franchise Agreement provides Plaintiffs with the option to renew the Franchise Agreement for five (5) additional periods of ten (10) years each, however, the renewal is conditioned on Plaintiffs' satisfaction of eight (8) separate requirements, as set forth in subsections (a) through (h) of Section 4.2 of the Franchise Agreement. *Id*. at Section 4.2.

23. One of the requirements for renewal, as set forth in Section 4.2(b), is that Plaintiffs execute HCA's "then current standard form of Franchise Agreement, which may, at [HCA's] sole and absolute discretion, include substantially different terms than those contained in [the] Agreement, including but not limited to a higher royalty fee, a higher advertising contribution, a smaller Protected Territory, and the term of which shall be the renewal term and contain further renewal rights, if applicable." Plaintiffs' failure or refusal "to execute the renewal agreements and documents within thirty (30) days after their delivery to [Plaintiffs] will be deemed an election by [Plaintiffs] not to renew the franchise." *Id*. at Section 4.2(b).

24. The conditions HCA places upon obtaining a renewal franchise agreement are common in the franchise industry.

25. The Franchise Agreement contains both in-term and post-term covenants not to compete, which is also common in the franchise industry.

26. The post-term covenant not to compete is necessary to protect HCA's System, goodwill, business opportunities, franchise network, and to protect against unfair competition.

27. The post-term covenant not to compete is contained in Section 12.2 of the Franchise Agreement, and states, in pertinent part, that Plaintiffs acknowledge they "shall receive valuable training and confidential information" pursuant to the Franchise Agreement including, but not limited to, information concerning the promotional, operational, sales and marketing methods Defendant and its system. As such, Plaintiffs agreed, for a period of two years after the

term, that they will not:

a. divert nor attempt to divert any customer of the business, or customer of Franchisor, or other System Franchises, to any competitive business, or employ or seek to employ any of Franchisor's employees or the employees of any other Franchisees, or induce or seek to induce, such employees to leave their employment, or offer assistance, in any way, to any similar businesses anywhere in the United States; or

b. Directly or indirectly, for himself or through, on behalf of or in conjunction with any person, persons, partnership, corporation, limited liability company or other entity, own, maintain, engage in, consult with or have any interest in any business offering products or services the same as or similar to those products and services offered as part of the System described herein, (1) within a twenty (20) mile radius of the Location of the Franchised Business; or (2) within a twenty (20) mile radius of any other Home Care Assistance 1-866-4-LiveIn business.

28. Upon termination or expiration of the Franchise Agreement, Plaintiffs agreed to cease operation of the franchise, comply with all covenants not to compete in the Franchise Agreement, immediately turnover all manuals, records, customer lists, files, and all other confidential and proprietary materials relating to the operation of the franchise, assign the telephone number for the franchise to HCA, and at HCA's request, assign its lease for the franchise to HCA. *Id*. Section 19.1.

29. The Franchise Agreement does not require HCA to continue offering HCA franchises, to operate any company-owned locations, to use the same trademarks to operate its company-owned locations, to maintain a website, or to provide to its franchisees with any specific services at any specific or designated level.

**The Transfer Agreement**

30. On or about May 28, 2019, at Bruketta and Pascoe's request, HCA entered into the HCAFranchise Corporation Transfer Agreement with Bruketta and Pascoe (the "Transfer Agreement") allowing them to transfer their interest in the Franchise Agreement and the Franchised Business to Terrier, LLC ("Terrier"), a limited liability company wholly owned by Bruketta and Pascoe. A true and correct copy of the Transfer Agreement is attached as Exhibit B to Plaintiff's Complaint in this matter.

31. In the Transfer Agreement, Bruketta and Pascoe agreed to continue to be

5

personally bound by, and personally liable for breach of, Section 12 (Limitation on Competition) and Section 14 (Confidential and Proprietary System Information), and further agreed that, as to all disputes between the parties, they are bound by Section 20 (Dispute Resolution), and Paragraph 25.4 (Governing Law; Choice of Forum).

32. The Transfer Agreement contains no provisions related to, and makes no mention of, the 15-year term of the Franchise Agreement.

### Renewal Agreement

33. As a franchisor, HCA is required by federal law to provide its FDD, containing certain financial and other information and disclosures regarding its franchise opportunity, to a prospective or renewing franchisee before HCA can accept a signed, binding, new (or renewal) franchise agreement from a prospective or renewing franchisee.

34. Certain of the required financial and other disclosures contained in the FDD are tied to events occurring during a franchisor's previous fiscal year. Because of this, an FDD must be updated at least once a year.

35. Certain States that have State-specific franchise laws also require that a franchisor register its franchise offering in the State before the franchisor can sell a new franchise or renew an existing franchise in that State. Neither Nevada nor New Mexico has any such registration requirement.

36. HCA issued an FDD in June 2020 and registered the FDD in multiple States that require registration, including in California, Illinois, North Dakota, Rhode Island, South Dakota, Virginia, and Wisconsin. A true and accurate copy of HCA's 2020 FDD is attached as **Exhibit 3**.

37. Under both federal and State law, HCA's June 2020 FDD "expired," and could no longer be used with new or renewing franchisees, on or about April 30, 2021.

38. On or about May 21, 2021, Terrier provided HCA with notice that Terrier intended to renew its franchise agreement.

39. At the time HCA received the renewal notice from Terrier, HCA had not yet completed its updates to its 2021 FDD. As a result, HCA was not in a position to provide an FDD containing its then-current form of franchise agreement to Terrier.

40. Among other things, HCA's third-party auditor had not yet finished its audit of HCA's financial statements for HCA's fiscal year ending December 31, 2020.

41. As certain financial information from HCA's prior year audited financial statements was required by law to be included in HCA's updated FDD, HCA could not issue its updated FDD until the audit was completed.

42. HCA's third-party auditor completed its audit of HCA's financials on or about August 31, 2021.

43. HCA finalized and issued its updated FDD three days later, on September 3, 2021.

44. In connection with Terrier's renewal request, HCA sent Terrier a copy of its September 2021 FDD on or about September 9, 2022. A true and accurate copy of the email is attached hereto as **Exhibit 4**. Terrier subsequently executed and returned a signed receipt to HCA. A true and accurate copy of the signed receipt is attached hereto as **Exhibit 5**.

45. As reflected in a comparison of the 2020 franchise agreement and 2021 franchise agreement, the only substantive changes to the 2021 agreement from the 2020 agreement are HCA's deletions of obligations imposed on franchisees to pay a "Satisfaction Survey Fee" (2020 Agreement Section 6.5) and to pay for any initial training provided to more than four people (2020 Agreement Section 11).

46. On or about September 22, 2021, Bruketta emailed me regarding the renewal franchise agreement that was contained in the September 2021 FDD I sent her. A true and accurate copy of the email is attached hereto as **Exhibit 6**. In her email, Bruketta mentioned her concern about the "significant changes" from Terrier's Franchise Agreement set forth in the new-form of franchise agreement contained in the FDD, including the Purchase Right provision, and she proposed some alternative terms for the renewal agreement. HCA did not accept the terms proposed by Terrier.

47. On or about November 3, 2021, Bruketta sent a follow-up email asking HCA to either waive the requirement of an in-person 2-hour meeting and "moving direct to arbitration," or schedule that meeting. A true and accurate copy of the email is attached hereto as **Exhibit 7**.

48. In November 2021, Terrier and members of the HCA team and their counsel held

an in-person meeting in Las Vegas to address the issues raised by Terrier and attempt to resolve them.

49. I have not discussed potential enforcement of the post-term non-compete with Plaintiffs at any time.

50. I am aware that, like other franchisees, Plaintiffs have periodically invested in their business. Plaintiffs have not informed me of any investment in their business occurring after execution of the Transfer Agreement that exceeds $500,000.

51. From the date of my position with HCA, HCA has provided and continues to provide the below support services to its franchise network:

    a. Business Coaching - bi-weekly or monthly at the franchisee's preference. Petitioner prefers monthly engagement and has received monthly engagement since the start of my position with HCA.

    b. Monthly Video Conference Owners' Cohort, which I moderate for all franchises to share best practices and learnings, and which we increased during the key periods of the COVID-19 pandemic to help franchisees respond to new issues.

    c. Periodic webinars for owners and staff on topics such as employee care, client care, marketing, sales, and operational management

    d. An Annual Franchise Conference hosted by HCA that brings all franchisees together to recognize achievements, celebrate leaders, provide training and recognize our caregiver of the year across the network. These annual meetings are in person or since the pandemic, via videoconference.

    e. A Newsletter regarding sales strategy, recognition of employees and owners, upcoming events and other network updates.

    f. A resource library on the company intranet. The HCA intranet contains an extensive library of key documents to successfully operate a franchise in the network, including our operation model, relevant manuals for processes and forms, recorded trainings, best practices, COVID-19 related library and resources, and other key documents.

Throughout my time as head of franchising, I have observed that Bruketta and Pascoe regularly participated in these activities and took advantage of several of these resources.

52. HCA has not, and does not currently charge Petitioner, or other franchisees, for a marketing fund. Franchisee owners have always funded their own marketing, including maintaining and promoting their own websites.

53. Plaintiffs' franchise business has always hosted its own site at https://homecareassistanceofalbuquerque.com/.TheKey does not operate or market in Plaintiffs' protected territory. Clients searching for care on the company website within Plaintiffs' territory are directed to Plaintiffs' website.

54. I did not receive any formal notification of any breach of the Franchise Agreement by HCA prior to the Complaint in this action being filed.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 26, 2022



MICHELE BOEHMER